## Thomas C. Worthington and Isaac Anderson *vs.* Mary E. Shipley.—*December*, 1847.

*S.* being indebted to *W.*, in 1839, and not having paid that debt, in 1841, made a voluntary conveyance to his daughter of certain negro slaves. The consideration stated in the deed was love and affection, as well as money paid; but no money was in fact paid. There was no proof in the cause tending to prove an express delivery of the slaves, by the father to his daughter, at any time prior to the execution of the deed in 1841. In 1842, *W.* recovered judgment against *S.*, and levied a *fieri facias* upon the slaves in question: and the daughter claiming as well by parol gift from her father as by his deed, sued out an injunction to prevent a sale. The answer impeached the deed of 1841, as made by an insolvent grantor, and as fraudulent and void. *Held*,

1. Under the act of 1763, ch. 13, the delivery of slaves, the subject of a parol gift, must be express, and made at the time of the gift.
2. That the title of the daughter, who claimed the injunction, depended entirely upon the deed of 1841.
3. Under the statute of 13 *Eliz.*, ch. 5, an indebtment by a grantor, at the time of the voluntary conveyance made, is *prima facie* only, and not conclusive evidence of a fraudulent purpose, with respect to a prior creditor.
4. This presumption may be repelled by showing that the grantor, or donor at the time of the gift, was in prosperous circumstances, possessed of ample means to discharge all his pecuniary obligations; and that the settlement impeached was a reasonable provision for his child, according to his or her station and condition in life.
5. A voluntary conveyance, made by a donor loaded with debt, involved with embarrassments, approximating to insolvency, or the owner of an estate not adequate to the payment of the claims against him, is fraudulent and void, against a prior creditor seeking to impeach it.
6. The word "*voluntary*" is not to be found in the statute of 13 *Eliz.*, ch. 5. Deeds founded upon a good consideration, if made *bona fide*, are expressly excepted from its operation. Its provisions are directed against transfers concocted in fraud, and fabricated and devised by the debtor, for the purpose of delaying and defrauding his creditor.

The case of *Reade vs. Livingston*, 3 *John. C. R.* 481, erroneous as to the exposition given to the statute, 13 *Eliz.*, ch. 5.

Appeal from the Court of Chancery.

The bill in this cause was filed on the 28th September, 1842, by the appellee, and alleged, that on or about the 3d August, 1840, two negro girls, slaves for life, *Kitty & Nancy*, were conveyed to your oratrix by *James Shipley*, by a deed bearing date the day and year aforesaid, and duly acknow-

ledged and recorded, a certified copy of which is herewith exhibited, that said negro girls have been seized and taken out of the possession of your oratrix by one *Isaac C. Anderson*, the sheriff of *Howard District*, by virtue of a supposed authority derived from a writ of *fieri facias*, issued on or about the 23d September, 1842, upon a judgment rendered in the case of *Thomas C. Worthington*, administrator of *Charles G. Worthington* against *James Shipley*, by the court of *Howard District* of *Anne Arundel* county, at the March term, of said court, in the year 1841, that said writ of *fieri facias*, issued against the property of *James Shipley*, the defendant in said case, and who is the same party, from whom your oratrix derived title to said girls as aforesaid, that the said plaintiff, *Thomas C. Worthington*, has directed the said sheriff, to seize and take said girls, under said writ of *fieri facias*, that they were so seized, and taken on or about the twenty-fourth day of September, 1842, and that said sheriff is about to sell them, to satisfy the said judgment under the writ aforesaid, that said negro girls, became the property of the said *James Shipley*, who is the father of your oratrix, through his wife who is now dead, and who was the mother of your oratrix, that the said *S.* was induced to convey said girls to your oratrix, by the death-bed solicitations of her said mother, who requested said *S.* to give all the negroes, who came to him through her, upon her marriage to her several children in the manner then pointed out by her; that said *S.* gave said girls to your oratrix during the life time of his wife, and at her urgent solicitation, and that said deed was made in pursuance of said gift.   And your oratrix avers and charges that said negroes never were the property of the said *James Shipley*, but were given to her mother during her life-time, and after her death to your oratrix, by her grandfather *Nehemiah Moxley*.   That she apprehends that said girls may be placed beyond her reach and control, and that they are favorite negroes with your oratrix, both on account of the manner in which they became the property of your oratrix, and on account of their own good character, and to the end, that said two negroes may again be delivered up to your oratrix,

that the said sheriff may be restrained from selling said negroes, or disposing of them beyond the reach of your oratrix, and for other and further relief. *Prayer* for subpœna and injunction, &c.

With this bill was exhibited the following bill of sale :

"Know all men by these presents, that I, *James Shipley*, of *Howard District*, &c. for the natural love and affection, which I entertain for my daughter *Mary Ellen Shipley*, in consideration of the sum of $300 money to me in hand paid by the said *M. E. S.* of, &c., at and before the sealing and delivery of these presents, the receipt whereof, I, &c. have granted, bargained and sold, and by these presents, do grant, bargain, and sell, unto the said *M. E. S.* her &c., one negro woman, named *Catharine*, aged about twenty-five years, and one negro girl named *Nancy*, three years of age, to have and to hold, the said negroes above bargained and sold, or mentioned, and intended to be sold to the said *M. E. S.*, her &c., forever, &c. I, the said *J. S.* have put the said *M. E. S.* in full possession, by delivering to her, the said *M. E. S.* the above named negroes, at the sealing and delivery of these presents, in the name of the premises, hereby bargained and sold, or mentioned, and intended to be sold, unto her, the said *M. E. S.* In witness, whereof, I, the said *J. S.* have hereunto subscribed my name, and affixed my seal, this 3d of August, 1841.

Witness, James Martin.     James Shipley, [*Seal.*]"

Recorded the 3d day of August, 1841—and duly certified. And the following judgment.

Court of *Howard District* of *Anne Arundel* county, March term, 1842.

Thomas C. Worthington, adm'r, of ⎫     March 14th, 1842,
   Charles G. Worthington          ⎬     judgment by confes-
            *vs.*                  ⎬     sion for $568 47 debt,
   James Shipley.                  ⎭     and $1000 damages
and costs, damages to be released on payment of interest on debt, from 22d November 1839, and costs.

Test,                         John L. Moore, *Clerk.*

On the 28th September 1842, the Chancellor (Bland)

ordered subpœna and injunction as prayed, bond being filed and approved.

The answer of *Thomas C. Worthington,* administrator of *C. G. W.* denies that the negro girls, *Kitty* and *Nancy,* were conveyed to *M. E. S.,* by her father *J. S.* by deed bearing date the 3d August, 1840, but avers that the conveyance above referred to, was made on the 3d August, 1841. He admits that said negro girls, were seized and taken by the sheriff of *H. D.* by the direction of this respondent, under an execution or *fieri facias,* issued as alleged in the short copy filed with said bill. He admits that the negroes *Kitty* and *Nancy* aforesaid, are the children, or descendants of a negro woman who was given to the mother of the complainant, on or about the marriage of complainant's father and mother, by *Nehemiah Moxley, Junr.,* her grandfather, and that the title to said negroes was derived by complainant's father, by the gift aforesaid. This respondent does not know whether complainant's mother requested the said *James Shipley,* to give to her children all his negroes which came by her, but he denies that any gift was made of said negroes, *Kitty* and *Nancy,* to complainant in the life-time of her mother, or at any other time before the execution of the deed exhibited by complainant, and he denies also, that said negroes were given to complainant's mother during her life-time, and after her death, to the complainant, by the said *Nehemiah Moxley, Jr.,* but he avers that they were given absolutely to the wife of said *J. S.,* and thereby became his property. This respondent in his answer further states, that about the year 1840, the said *J. S.* became the collector of taxes for *Anne Arundel* county, in that part of said county, now known as *Howard District,* for the tax levied for the year 1839, and to be collected in the year 1840. That at this time the said *J. S.* was possessed of a life estate, in a farm which he derived through his wife, a farm in fee simple, containing about one hundred and eighty acres, and a brick house and lot in the village of *Ellicott's Mills,* together with the negroes gotten by his wife, and perhaps some few others, and a small amount of other personal property. That about this time, the said *J. S.* purchased

a lot of ground in the village aforesaid, from a certain *Edwin P. Hayden*, and commenced the erection of a large stone edifice, which was in progression until the fall of 1841, when it was obliged to be abandoned for want of funds, after expending a large sum of money. That, when the time arrived for the settlement of the said *James Shipley* of the account as collector, as aforesaid, he was found greatly in arrears to the commissioners of *Anne Arundel* county, and unable to pay, and on the eighth day of September, 1841, suit was instituted on his bond in *Howard District* court, and judgment obtained against him, at March term, 1842, for the sum of $4673 69 cents with interest. That, in the year 1841, being pressed by his creditors, for the settlement of their claims, and a little more than a month before the commencement of the suits of the commissioners of *A. A.* county, and this respondent, to wit: on the 2d August, 1841, the said *J. S.* executed a mortgage, to a certain *William H. Worthington*, for the farm of one hundred and eighty acres aforesaid, conditioned, to save him harmless from any loss he might sustain, as one of his securities on his bond, as collector of taxes as aforesaid, and on the same day, executed the deed to complainants, together with other deeds of a similar nature, conveying negroes to his children. That, on the 9th November 1841, the said *J. S.* mortgaged his brick house and lot aforesaid, in the village of *Ellicott's Mills*, to a certain *Thomas Lister*, for $1200. This respondent further states, that he has been informed, and believes, that the said *J. S.*, was in the year 1840, and still is indebted to the estate of *Nehemiah Moxley, Senr.*, whose administrator he was in the amount of ten or twelve hundred dollars. That in the year 1840, or 1841, the said *James Shipley*, married for a second wife, a certain *Harriet Lindsay*, a woman of no fortune, and after having purchased, and paid for the lot, aforementioned, from the said *Edwin P. Hayden*, but before he had obtained a conveyance for the same, to wit: on the 14th March, 1842, the day of the rendition of the judgments in favor of the commissioners of *Anne Arundel* county, and of this respondent, the said *J. S.* procured a conveyance

of the same, together with the building partially thereon erected, as aforesaid, to be made by the said *E. P. H.*, to the brother of the said *Harriet*, wife of said *J. S.*, for her separate use; that at the time of the execution of the deed aforesaid, to said complainant, of said negro girls, the said *James Shipley* had no other property, except that above described, and except a small amount of household stuff, and perhaps a negro man, or negro woman, this respondent does not know which, lived in the city of *Baltimore*. This respondent avers, that at the time of the conveyance of the said negroes, to the complainant, that the indebtedness of the said *James Shipley*, was such, that his whole property would not have discharged his liabilities. That the valuable consideration mentioned in said conveyance was false and fraudulent, as well as the same consideration mentioned in the other deeds, conveying to his children his other negroes, and conveying his house and lot in trust, for his wife, as aforesaid. This respondent further states, that in addition to the other conveyances, made by the said *J. S.*, in the year 1841, he sold and conveyed in the same year his life estate, in the farm aforesaid, which he acquired through his wife, to *Nehemiah Moxley, Junr.*, that the deed aforesaid, made by the said *J. S.*, to his daughter *M. E. S.*, was made with the view to defraud his creditors, and among the rest this respondent, and is void. That at the time the said negro girls, *Kitty* and *Nancy*, were taken by the sheriff of *Howard District* as aforesaid, they were the property of the said *J. S.*

With the answer was filed a short copy of the judgment of the commissioners of *Anne Arundel* county, of 14th March, 1842, by confession for $4,673 69, &c., with interest from Oct., 1840.

The sheriff of *Anne Arundel* also answered the bill, but his answer is not material.

A commission to take proof was issued: the material parts of the proof taken are stated in the opinion of this court.

At September term, 1845, the Chancellor (BLAND) decreed the injunction to be perpetual, with costs. And the defendants appealed to this court.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, MAGRUDER and MARTIN, J.

By T. S. ALEXANDER for the appellants, and

By E. HAMMOND for the appellee.

MARTIN, J., delivered the opinion of this court.

By the act of Assembly, of 1763, ch. 13, it is declared, that no negro or other slave, whereof the donor shall retain the use and possession, shall be transferred to any donee unless the gift be by writing, under the hand and seal of the donor, and acknowledged and recorded, as therein prescribed ; with the *proviso*, that nothing contained in the act shall be construed to make void any parol gift of any negro or other slave, where there shall be an express delivery of such slave in pursuance of such gift, and where the sale, use and possession of the same shall be transferred to the donee.

In the case of *Coale* against *Harrington*, 7 *H. & John.* 156, the Court of Appeals held, that :

" By the act of 1763, ch. 13, a gift of negroes is only re-quired to be by deed, acknowledged and recorded, where the donor retains possession; that solemnity not being authorized, or required by law, when the possession passes to the donee, by delivery, at the *time*, and in *pursuance of the gift*, an office copy in such case of a bill of sale, is not competent evidence to prove title in the donee."

We have not been able to discover in this record any evi-dence even tending to prove that there was an express delivery of these slaves by *James Shipley* to his daughter at the time and in pursuance of the verbal gift alleged to have been made in the life-time of *Mrs. Shipley ;* and we have referred to the act of 1763, and quoted the construction placed upon it, by the Court of Appeals, for the purpose of showing, that the parol gift asserted to have been made in this case, cannot be main-tained ; and that the title of the appellee to the slaves in con-troversy, must depend entirely upon the validity of the bill of sale of the 3d August, 1841.

It appears from the evidence in the cause, that this bill of sale was a voluntary conveyance of the two slaves mentioned in the proceedings by *James Shipley* to the appellee, who is his daughter. Although there is a monied consideration stated in the instrument, it is conceded that this was merely formal, and that the only consideration existing between the donor and donee, was that of love and affection. The debt of the appellant was created as early as the 22d November, 1839, and was therefore antecedent to the execution of the deed. And the question presented for our consideration, is, whether this conveyance is to be treated as fraudulent and void under the statute of 13 *Eliz.* ch. 5, with respect to this creditor upon the circumstances of the case as exhibited in the record.

It cannot be denied, that there has been some diversity of judicial opinion both in the English courts and in the tribunals of this country, with respect to the exposition of this statute, as applied to a voluntary conveyance from a father to his child, when attempted to be impeached by an antecedent creditor.

This subject was considered by the Supreme Court of *Connecticut*, in the case of *Salmon* against *Bennett*, decided in 1816, 1 *Connec.: 525*; and we refer to the opinion as enunciating, what we consider to be the true interpretation of the statute of 13 *Eliz.* ch. 5: a construction which is certainly in accordance with the doctrine upon this point, as it is now established, by an almost unbroken series of modern decisions in England, and in the United States.

At page 542—the court say:

" Fraudulent and voluntary conveyances are void as to creditors; but in the case of a voluntary conveyance, a distinction is made between the children of the grantor and strangers. Mere *indebtedness at the time will not, in all cases, render* a voluntary conveyance void as to creditors where it is a provision for a child in consideration of love and affection; for if all gifts by way of settlement to children, by men in affluent and prosperous circumstances, were to be rendered void upon a reverse of fortune, it would involve children in the ruin of their parents, and in many cases might produce a greater evil than

that intended to be remedied. Nor will all such conveyances be valid; for then it would be in the power of parents to provide for their children at the expense of their creditors. Nor is it necessary that an actual or express intent to defraud creditors should be proved; for this would be impracticable in many instances, where the conveyance ought not to be established. It may be collected from the circumstances of the case. But in all cases, where such intent can be shown the conveyance would be void, whether the grantor was indebted or not. In order to enable parents to make a suitable provision for their children, and to prevent them from defrauding creditors, these principles have been adopted, which appear to be founded in good policy, where there is no actual fraudulent intent, and a voluntary conveyance is made to a child in consideration of love and affection, if the grantor is in prosperous circumstances, unembarrassed, and not considerably indebted, and the gift is a reasonable provision for the child according to his state and condition in life, comprehending but a small portion of his estate, and leaving ample funds unincumbered for the payment of the grantor's debts, then such conveyance will be valid against debts existing at the time. But though there be no fraudulent intent, yet if the grantor were considerably indebted and embarrassed at the time, and on the eve of bankruptcy; or if the value of the gift be unreasonable, considering the condition in life of the grantor, disproportioned to his property, and leaving a scanty provision for the payment of his debts; then such conveyance will be void as to creditors."

This question came before the Supreme Court, in *Hinde's Lessee* against *Longworth*, 11 *Wheat.* 213, in 1826. It was the case of a voluntary conveyance by a father to his son, and impeached by antecedent judgment creditors, as fraudulent under the statute of 13 *Eliz.* Upon this point, *Mr. Justice Thompson*, in delivering the opinion of the court, said:—

" A deed from a parent to a child, for the consideration of love and affection, is not absolutely void as against creditors. It may be so under certain circumstances; but the mere fact of being in debt to a small amount, would not make the deed

fraudulent, if it could be shown that the grantor was in prosperous circumstances, and unembarrassed, and that the gift to the child was a reasonable provision according to his state and condition in life, and leaving enough for the payment of the debts of the grantor. The want of a valuable consideration may be a badge of fraud, but it is only presumptive, and not conclusive evidence of it, and may be met and rebutted by evidence on the other side."

The question with respect to the true construction of the statute of 13 *Eliz.* was considered by *Lord Langdale,* in 1840, as the master of the Rolls, in *Townsend* against *Westacott,* 2 *Beavan Rep.* 345. He said:

" There has been a little exaggeration in the arguments on both sides as to the principle on which the Court acts in such cases as these: On the one side it has been assumed that the existence of any debts at the time of the execution of the deed would be such evidence of a fraudulent intention as to induce the Court to set aside a voluntary conveyance, and oblige the Court to do so under the statute of *Elizabeth.* I cannot think the real and just construction of the statute warrants that proposition, because there is scarcely any man who can avoid being in debt to some amount; he may intend to pay every debt as soon as it is contracted, and constantly use his best endeavors, and have ample means to do so, and yet may be frequently, if not always indebted in some small sum; there may be a withholding of claims, contrary to his intention, by which he is kept indebted in spite of himself; it would be idle to allege this as the least foundation for assuming fraud, or any bad intention. On the other hand, it is said that something amounting to insolvency must be proved to set aside a voluntary conveyance; this too is inconsistent with the principle of the act, and with the judgments of the most eminent judges."

In the late case of *Gale* against *Williamson,* 8 *Mees. & Wels.* 409. The same doctrine was held in the *Exchequer,* by *Lord Abinger & Rolfe Baron.*

*Rolfe*—*B.* at page 410, says:

" It is a mistake to suppose that the statute, (13 *Eliz.*) makes

void as against creditors all voluntary deeds. All that it says, is, that a practice of making covinous and fraudulent deeds had prevailed, and, therefore, that all feoffments, gifts, &c., of any lands or goods, and chattels, as against the persons whose actions, debts, &c., by such covinous and fraudulent devices and practices shall be disturbed, hindered, delayed, or defrauded, shall be void. The Courts in construing the statute have held it to include deeds made without consideration, as being *prima facie* fraudulent; because necessarily tending to delay creditors. But the question in each case is, whether the deed is fraudulent or not; and to rebut the presumption of fraud, the party is surely at liberty to give in evidence all the circumstances of the transaction."

The same proposition is declared by the *Lord Chancellor* and by *Eyre Baron*, in the case of *Jones vs. Boulter*, 1 *Cox Rep.* 288. 1 *Story Eq. Sec.* 364, (note) *Lord Chancellor B. Skinner* is reported to have used this language: "There is no mention in the act (*Stat.* 13 *Eliz.*) of voluntary conveyances; and the question has always been, whether in the transaction there has been fraud or covin. There were creditors at the time, and this is said always to have been a badge of fraud. It is true that this circumstance is always strong evidence of fraud. But if there be other circumstances in the case, that alone will not be sufficient." And *Lord Mansfield*, in *Cadogan vs. Kennett*, decided in 1776, *Comp.* 434, held:

"That a voluntary conveyance may be good against creditors, notwithstanding its being voluntary. The circumstances of a man being indebted at the time of his making a voluntary conveyance is an argument of fraud. The question in every case is, whether the act done is a *bona fide* transaction, or whether it is a trick and contrivance to defeat creditors."

In considering this subject, it is to be remarked as already stated, that the word *"voluntary"* is not to be found in the statute. Deeds founded upon a good consideration, if made *bona fide*, are expressly excepted from its operation; and it is perfectly clear, from the preamble of the statute, that its provisions were pointed not at voluntary conveyances *as such*, but against transfers

concocted in fraud, and fabricated and devised by the debtor for the purpose of delaying and defrauding his creditor.

Yet the construction put on the statute, by those who held that an indebtedness at the time of the conveyance conclusively fastens upon the instrument a fraudulent character, as an inference of law, practically and necessarily places voluntary conveyances and fraudulent conveyances, in the same predicament. Upon this construction, every voluntary conveyance must be a fraudulent conveyance with respect to the antecedent creditor.

A proposition of this kind cannot be maintained, and with great respect for the judgment of the eminent Judge, who delivered the opinion, in *Reade* against *Livingston,* 3 *John. Ch. Rep.* 481, we think, he erred in the exposition which he has given to the statute of 13 *Eliz.*

We therefore consider it as now established, at least by a decided preponderance of authority, and upon principles alone consistent with a just and rational interpretation of the statute, that an indebtment at the time of the voluntary conveyance, is *prima facie* only, and not conclusive evidence of a fraudulent purpose, even with respect to a prior creditor; and that this presumption may be repelled by showing that the grantor or donor at the time of the gift was in prosperous circumstances, possessed of ample means to discharge all his pecuniary obligations, and that the settlement upon the child was a reasonable provision, according to his or her station and condition in life.

Testing the voluntary conveyance in this case, by the rule thus announced, there can be no doubt that it must be pronounced fraudulent and void. The donor at the period of its execution was literally loaded with debt; was involved in embarrassments approximating to insolvency, and the owner of an estate, so far as it was unincumbered, certainly not adequate to the payment of the claims against him.

It is clear upon all the cases, that a voluntary conveyance made under such circumstances cannot be upheld against a prior creditor's seeking to impeach it.

As the appellee failed to establish a valid title to the slaves

taken in execution at the instance of the appellant, the Chancellor erred, we think, in making the injunction perpetual.

A decree will be signed reversing the decree of the Chancellor, and dismissing the complainant's Bill.

**DECREE REVERSED AND BILL DISMISSED.**