SEPTIMUS D. SEWELL
vs.
JAMES BAXTER AND WIFE ET AL.
} March Term, 1851.

[PAROL EVIDENCE—VOLUNTARY CONVEYANCE VOID AS TO CREDITORS—RESULTING TRUSTS—LACHES AND LAPSE OF TIME.]

The decisions in this state, are conclusive to show that parol proof is inadmissible, to vary the consideration stated in deeds, and thereby, either to alter their character, or to maintain them when impeached for fraud, by showing considerations, differing from those mentioned in them, though evidence of the same kind of consideration, varying only in amount from that expressed, may be offered.

An indebtment at the time of making a voluntary conveyance is, in this state, *prima facie* only, and not conclusive evidence of a fraudulent purpose, even with respect to a prior creditor, and this presumption may be repelled, by showing that the grantor, at the time of the gift was in prosperous circumstances, possessed of ample means to pay his debts, and that the settlement upon the child, was a reasonable provision, according to his or her station and condition in life.

Yet, when such indebtedness is shown, the burthen is thrown upon the grantee of establishing the circumstances which shall repel the fraudulent intent, and the

deed stands condemned as fraudulent upon the rights of creditors, unless the facts which may give it validity, are brought before the court by the grantee.

Resulting trusts, implied by law, from the manifest intention of the parties, and the nature and justice of the case, are expressly excepted from the operation of the statute of frauds, and the fact of payment may be established by parol proof.

But though it is competent to the party to prove the fact of payment by parol, yet it is indispensably necessary, that it should be made out by plain, direct, and unequivocal evidence.

S. in 1824, purchased certain lands at sheriff's sale, as the property of one J. S., who was then in possession thereof, and exercising acts of ownership over the same, and in 1831, took a deed from the sheriff therefor. In 1839, J. S., took from S., a lease of these lands for 99 years, at the annual rent of $ 53. In 1842, after the death of J. S., the defendants, B. and wife, took possession, and denying the title of S., asserted their own under a voluntary conveyance from J. S., to his daughter, the wife of B. executed in 1819. S. died in 1848, having devised the property to the complainant, who, in 1849, filed his bill for the recovery of the rent reserved by the lease, and to vacate the deed, of 1819, as fraudulent and void. HELD—

That the possession of J. S., from 1839, when the lease was executed, down to 1842, when he died, under the lease from S. cannot be used against him, as J. S. then held as his tenant, and that the period which intervened from that time to 1849, when the bill was filed, was too brief to prevent a successful assertion of the complainant's title, if in other respects it is free from objection.

———

[The bill was filed by Septimus D. Sewell, of Harford county, on the 20th of August, 1849. It alleges that a certain Joshua Swan, late of Baltimore county, deceased, was in his lifetime seized and possessed of certain lands, lying in the county last aforesaid, which, on the 22d of October, 1819, he conveyed to his daughter, Emily Augusta Swan, now the wife of the defendant, James Baxter. That before and at the time of said conveyance, said Swan was largely indebted unto divers persons, and among others to Charles S. Sewell and Matthew Murray, and that said conveyance was made without any good or valuable consideration, that on its face it purports to be made in consideration of the natural love and affection which the grantor bore to his said daughter, and, in fact, the same was made fraudulently, and with intent and in furtherance of a conspiracy between the parties thereto, to delay, hinder and defraud, the said Sewell & Murray, and other creditors of the grantor. That said Swan, after the execution of said deed, retained possession

of the premises mentioned therein, continually cultivating and taking to his own use, the rents, issues and profits thereof. That at the September term, 1821, of Baltimore County Court, said Sewell recovered judgment against said Swan for $2,000, and costs, and said Murray, at the same time, recovered a like judgment for $8,000 and costs, which were for the debts due and owing them respectively, before the date of said conveyance, the payment of which were thereby intended to be delayed and hindered. That writs of *fieri facias* were issued upon said judgments, under which the said lands were taken and sold to said Sewell, who paid the purchase money therefor to the sheriff. That at the time of said sale, Swan was possessed of the lands, taking to his own use the rents and profits thereof, and immediately thereafter, acknowledged the title of Sewell, as purchaser, and agreed to become his tenant, and pay a yearly rent for said lands. That the said Sewell, on the 15th of April, 1839, demised the premises to said Swan, being tenant as aforesaid, for the term of ninety-nine years, at the yearly rent of $53, in virtue whereof, said Swan remained in possession of said premises continually, taking the rents and profits thereof, and occasionally paying moneys on account of the rent reserved as aforesaid until his death in 1842. That after the death of said Swan, the said James Baxter and Emily his wife entered upon the premises, claiming title thereto under said deed from Swan to the said Emily, well knowing, however, the fraudulent character thereof, the title of Sewell as purchaser, and the said lease from Sewell to Swan. That further to delay, hinder and defraud said Sewell, the said Baxter and wife, in collusion with the grantees therein named, on the 27th of March, 1845, conveyed a part of said premises to one James Parlett, and another part to one John Moore, and on the 1st of November, 1847, another part to one William Buckingham, copies of which conveyances are filed with the bill. That said grantees at the time these conveyances were made, had notice of Sewell's title, and of the fraudulent origin of the pretended title of Baxter and wife. That they were made fraudulently, and without any good or valuable consideration, and that the

39*

grantees now hold possession as tenants of Baxter and wife, with the unlawful purpose of defending their pretended title. That said Sewell hath lately died, leaving a will, whereby he has devised said premises to the complainant and his heirs. That complainant so entitled, has demanded from said parties payment of the rent reserved by the lease, insisting that as said Baxter and wife obtained possession of the premises only by reason of their near relationship to said Swan, and now hold the same, so far as undisposed of, as his executor and executrix, and as they could only convey, or assign, any interest in said premises by virtue of their title as executor and executrix, they and their assignees are bound to pay to him the rent reserved by the lease, but the said grantors and grantees, intending to hinder, delay and defraud your orator in the collection of his rents, refuse to pay the same; at one time pretend they are the assignees of Swan, as lessee as aforesaid, and, therefore, deny your orator's right to the possession of the premises, and again pretend that the conveyance from said Swan to his daughter, the said Emily, is a valid conveyance, and, therefore, deny the right of Sewell as purchaser. The bill then prays that the deed from Swan to the said Emily Baxter, and the several conveyances from Baxter and wife to Parlett, Moore and Buckingham may be adjudged to be fraudulent and void, and be delivered up to be cancelled, or may be declared to operate only by way of assignment of the interest of Swan in said premises, as lessee as aforesaid, and for general relief.

*James Baxter*, by his answer, admits that he knows nothing of the matters charged in the bill relating to the title of said Sewell to the lands in controversy, except by hearsay, from his wife, the said *Emily*, who, by her answer, filed on the 17th of November, 1849, alleges that her uncle, James Helm, by his will, devised all his estate to her, of which a certain negro man named "Zach," constituted a part. That this negro was sent out of the state by the persons to whom he was hired, and was lost to respondent. That her father, the said Swan, instituted suit for the value and hire of said negro for use of respondent, in his own name, and recovered and received the sum of $1,017

on the 4th of May, 1818. That he further applied a portion of the money so received, in purchase of the lands in Baltimore county, mentioned in the bill. That at the time of making this purchase, and frequentiy afterwards, her said father told respondent that a deed should be given to her for said lands, with which arrangement she was satisfied, relying upon her father so appropriating her said money as to be useful to her. That she believes her father paid for the lands at the time of taking the deed for the same, which is dated 28th of October, 1818. That besides the consideration money ($300) mentioned in this deed, he further applied about $500 more of respondent's money towards paying a mortgage on a lot of ground in the city of Baltimore, mentioned in the deed filed with the bill as exhibit A, there still remaining in the hands of her father, the sum of $262, or thereabouts, of her money. That matters so remained until the fall of the following year, and whenever spoken to on the subject, her father continually told respondent that she should have the lands and lot so as aforesaid purchased with her money. That in the fall of 1819, respondent being about to marry with her first husband, Nelson R. Hall, her father executed to her the said deed, exhibit A, that the actual consideration therefor was the said sums of $300 and $500 of her money applied by her father, and the said sum remaining in his hands and retained by him. That she thus actually paid for the lands so conveyed to her, the full consideration of $1,017. That having thus shown what consideration was paid, she declares it to be untrue, and utterly denies the allegation of the bill, that the said conveyance was made without any good or valuable consideration, or that it was made fraudulently with a design to delay, hinder or defraud the creditors of her said father. And she denies notice or knowledge of any indebtedness of her father to said Sewell or Murray, or either of them, prior to the execution of said deed. She admits that her father occupied said lands from the date of said deed up to the time of his death. That respondent resided upon them during a large portion of said period, she believes for more than ten years, and permitted her father to occupy

the same, as stated in the bill, because he was poor and afflicted, and because she was enabled to live without taking to her own use, the profits of said lands, and she never supposed that an act of kindness to a poor and aged parent, could, in any degree, impair her title under said deed; that she certainly never, in any manner, abandoned her right to occupy said lands at any time she might think proper so to do. She and her husband, the said James Baxter, admit, that after the death of said Swan, they entered upon the premises, claiming title thereto, and now hold a portion thereof, under said deed, and deny that they then had knowledge of the deed from Swan to Sewell, or of the lease from Sewell to Swan, and insist, that at the time of executing them, Swan had any title whatever to the premises, and they deny that they obtained permission or now hold the same or any part thereof as executor and executrix of said Swan, but, on the contrary, aver that they hold the same as owners thereof, under the deed of the 22d of October, 1819. They have no personal knowledge of the indebtedness of said Swan to Sewell and Murray, and put complainant to the proof thereof. They admit that they have sold and conveyed portions of said land to Parlett, Moore & Buckingham, but utterly deny that said sales or conveyances were made to carry into effect any fraudulent objects, or to delay, hinder or defraud the said Sewell, but aver that said sales were fairly made for good and valuable considerations received by respondents, and that said parties do not hold said parcels of said land, as tenants to respondents, but that they purchased such title as respondents had, and hold said lands accordingly. They admit the demand of rent and their refusal to pay, but deny that they have ever pretended that they are assignees of said Swan, as lessee of said Sewell, but have always and do now claim said lands by virtue of the deed of the 22d of October, 1819, made for a valuable consideration paid by respondent, Emily, as hereinbefore stated.

The answers of Parlett, Moore & Buckingham, filed at the same time, aver that they purchased the several parcels of said lands conveyed to them respectively, fairly and for a valuable consideration under the belief that the title of Baxter and wife

was good, and required by their several deeds, a safe and unin-cumbered fee simple title.

The deed of the 22d of October, 1819, from Joshua Swan to his daughter Emily Augusta, filed with the bill, as exhibit A, after reciting a conveyance to said Joshua by one Amos Loney, of a certain lot in Baltimore city, further recites, that "Whereas Matthew Murray, esquire, sheriff of Baltimore county, by his indenture bearing date on or about the 28th day of October, 1818, duly recorded," &c., "for the consideration therein men-tioned, did grant," &c., "unto the said Joshua Swan, his heirs," &c., "all that tract of land situated and lying in Baltimore county, called" &c., "containing 248 acres of land, more or less." "Now, this indenture witnesseth, that the said Joshua Swan, in consideration of the natural love and affection which he hath for and beareth towards his daughter, the said Emily Augusta Swan, and in further consideration of five dollars, lawful money paid," &c., and then conveys the land mentioned in the premises to the said Emily her heirs and assigns forever.

The various deeds and judgments referred to in the bill and answers, were proved under the commission, and also the fol-lowing single bill of Joshua Swan.

"I promise to pay on demand to Charles S. Sewell, or to his assigns, the full and just sum of three hundred and eighty dollars, for value received, as witness my hand and seal this tenth day of August, 1816.          JOSHUA SWAN. [L. S.]"

[The other portions of the testimony are sufficiently set forth in the opinion.]

THE CHANCELLOR:

On the 22d of October, 1819, the late Joshua Swan, by deed of that date, conveyed to his daughter Emily Augusta Swan, now the wife of the defendant, Baxter, in consideration of nat-ural love and affection, two parcels of land, situate and lying in Baltimore county, one of which had been conveyed to the grantor by Matthew Murray, sheriff of the county, on the 28th of October of the preceding year.

The bill in this case charges, that at the time of making said conveyance, the said Swan was largely indebted to divers persons, and among others to Charles S. Sewell and Matthew Murray, and that it was made fraudulently, and in furtherance of a conspiracy between the parties thereto, to delay, hinder and defraud the said Sewell and Murray, and the other creditors of the grantor. And this is the question now to be decided by this court.

Baxter and wife answered jointly, but as he professes to have no knowledge of the circumstances charged in the bill, except as derived from his wife, the answer, so far as he professes to speak, need not be adverted to. The questions in issue between the parties, grow out of the answer of Mrs. Baxter. She attempts to support the deed by alleging and attempting to prove that the land was purchased by her father for her, and paid for with her money, acquired from her uncle James Helm, in the mode pointed out in the answer. She repudiates the idea that the deed was simply voluntary in consideration of natural love and affection, and charges, that her father, having received her money, "applied a portion of it towards the purchase of the lands mentioned in the deed," and "that her father at the time of making the purchase, and frequently afterwards, told respondent, that the deed should be given to her for said lands, with which arrangement she was satisfied."

To the evidence offered to support this view of the case, the complainant has excepted, and it appears to me, clear, upon the authorities, that it is inadmissible. The deed, upon its face is voluntary, the nominal consideration of five dollars mentioned in it, being introduced simply to give it the character of a bargain and sale, and the question, therefore, is, whether it is competent to the grantee in this deed, to show by parol, that it was not a voluntary settlement by her father upon her, but, that the land conveyed to her by the deed, was purchased and paid for by her father with her money. The decisions in this state are conclusive to show, that parol proof is inadmissible to vary the consideration stated in deeds, and thereby either to alter their character, or to maintain them when impeached for fraud, by

showing considerations differing from those mentioned in them. The cases of *Wesley* vs. *Thomas*, 6 *Har. & Johns.*, 24; *The Union Bank* vs. *Betts*, 1 *Har. & Gill*, 175; *Wolfe* vs. *Hauver*, 1 *Gill*, 84; *Cole* vs. *Albers & Ringe*, 1 *Gill*, 412, and the cases cited therein, place this question beyond all controversy. In the last case, the doctrine of the inadmissibility of parol proof, of a different consideration from that stated in the instrument, was fully maintained, though it was allowed to the party in that case to offer evidence of the same kind of consideration, varying only in amount from that expressed.

I am therefore of opinion, that if this deed of October, 1819, can be maintained at all, it must be as a voluntary settlement by a father upon his daughter, in consideration of natural love and affection.

Authorities of imposing weight are to be found in the books, that any indebtedness at the time of executing such a settlement, will avoid it. That the inference of fraud, thence deducible, is an inference of law, incapable of explanation, and, therefore, that any voluntary conveyance is fraudulent with reference to pre-existing creditors, though the grantor may have abundant means, independent of the property conveyed, to satisfy all his creditors. This doctrine, however, in all its strictness, does not obtain in this state, it being here conclusively settled, "that an indebtment at the time of the voluntary conveyance, is *prima facie* only, and not conclusive evidence of a fraudulent purpose, even with respect to a prior creditor, and that this presumption may be repelled by proving that the grantor or donor, at the time of the gift, was in prosperous circumstances, possessed of ample means to discharge all his pecuniary obligations, and, that the settlement upon the child was a reasonable provision, according to his or her station and condition in life. *Worthington & Anderson* vs. *Shipley*, 5 *Gill*, 449. But though the rule is mitigated, still, if the grantor be shown to be indebted at the time of the conveyance, it is, *prima facie*, fraudulent with respect to creditors, and the burden is thrown upon the grantee of establishing the circumstances which shall repel the fraudulent intent. The deed stands con-

demned as fraudulent upon the rights of creditors, unless the facts, which may give it validity, are brought before the court by the grantee.

In this case, there can be no dispute, that Joshua Swan, the father, was indebted at the time of the conveyance. His single bill to Charles Sewell for $380, dated in 1816, is proof of this, and I think the presumption is, that the judgments recovered against him by Sewell and Murray in 1821, were for money due from him prior to the deed. But at all events, the amount expressed in the single bill must be assumed to have been due, and if so, with respect to this creditor, "the deed is, *prima facie*, fraudulent, and can only be supported by evidence of the facts which repel this presumption.

The question then, is, does this record furnish evidence, that at the time of making this voluntary conveyance to his daughter, the grantor was in prosperous circumstances, possessed of abundant means to discharge his engagements, and that the settlement upon his daughter was a reasonable one.

In answer to the allegation of the bill, that the grantor continued in the possession and use of the property after the conveyance, the respondent, Mrs. Baxter, says, "that she admits that said Joshua Swan, did occupy said lands from the date of said deed up to the time of his death. That this respondent resided upon said lands during a large portion of said period, she believes for nine or ten years, and permitted her said father to occupy the same, as averred in complainant's bill, because, her said parent was *poor* and afflicted, and because she was enabled to live without taking to her own use the profits of said lands. That the respondent never supposed that an act of kindness to a *poor* and aged parent, could in any degree impair her title under the deed aforesaid."

Now, looking to this answer, it is not possible to suppose that the grantor of this property was in prosperous circumstances, with ample means to pay his debts. On the contrary, it appears, that he become dependant upon his daughter for a home and livelihood. This is the inevitable presumption from the answer, and there is no proof, or attempt to prove, that he

held any other property. For aught that appears, he was absolutely destitute of means, and, therefore, viewing the deed as a voluntary one, it must fall, when set up against the claims of pre-existing creditors, even under the less stringent doctrine upon the subject established in this state.

But it has been supposed, that even if the defendants, Baxter and wife, cannot defend their title upon the deed of the 22d of February, 1819, they may rely with success upon that of the 28th of October, 1818, from Murray, the sheriff, to Joshua Swan, by showing, that the consideration money paid by the latter to the sheriff, was the money of Mrs. Baxter, as alleged in the answer. That is, that upon such proof, a trust would result to the party whose money actually paid for the property. It has been contended by the complainant's counsel, that parol proof is inadmissible to establish the fact of such payment, and the evidence is excepted to as inadmissible. The exception, however, in my opinion, cannot be maintained. Resulting trusts implied by law, from the manifest intention of the parties, and the nature and justice of the case, are expressly excepted from the operation of the statute of frauds, and the fact of payment may be established by parol proof. 4 *Kent's Com.*, 304, 305; *Dorsey et al.* vs. *Clarke et al.*, 4 *Har. & Johns.*, 551. But though it is competent to the party to prove the fact of payment by parol, yet, it is indispensably necessary that it should be made out by plain, direct and unequivocal evidence. In stating the rule, Chancellor Kent says, "when an estate is purchased in the name of A. and the consideration money is actually paid at the time by B. there is a resulting trust in favor of B., provided the payment of the money be clearly proved." But I do not find, in this case, that clear evidence which is required to make out a resulting trust, and even if the evidence was stronger than it appears to me to be, I should hesitate to give it the effect of engrafting a trust by implication upon this deed, in view of the subsequent deed of the 22d of October, 1849. If the money paid for the land was the money of Mrs. Baxter, and a trust resulted to her in consequence thereof, it is difficult to conceive a satisfactory reason for taking a deed of the char-

40

acter last mentioned. Why, if she furnished the purchase money, should she take a deed from her father for the consideration of natural love and affection ? Why did not the deed express the true consideration, with explanatory recitals, showing the facts, as they are now alleged to be ? These are questions which naturally suggest themselves, and the difficulty in giving satisfactory answers to them is calculated to create suspicion of the fairness of the transaction.

The real difficulty, as appears to me, in granting the relief prayed by the bill, results from the long time which has elapsed since the execution of the ,deed complained of. If the grantee had been in possession of the property, claiming it as her own from the date of the deed, until the bill in this case was filed, and had relied upon that possession in her answer as a bar to the relief prayed for, it might probably have been regarded as presenting a very formidable objection. But so far from doing this, the answer admits, that Swan, the grantor, continued to occupy the lands from the date of the deed until his death in 1842. The answer further says, it is true, that the respondent also resided on said lands during a portion of the time, but this occupation was not exclusive according to the admission of the answer, and if the evidence be referred to, there is certainly strong grounds for supposing, that the grantor possessed and held the land as his own, or, at all events, that he was by no means controlled in his enjoyment of it by the grantee and her husband. The evidence unquestionably does not make out a clear case of possession by the defendants, Baxter and wife, so as to enable them to set up that possession as a defence. The proof of possession by the grantor, at least creates a doubt, as to who was in the actual possession, and in my opinion, the weight of evidence is in favor of the possession of the grantor, at least for several years before his death. Sewell purchased from the sheriff in 1824, and took from him a deed in 1831. At that time, Swan was certainly living upon the property, and exercising unquestioned acts of ownership over it. It does not appear whether Sewell, the purchaser at the sheriff's sale, asserted his title, earlier than 1839, but on the 15th of April, of that year, Swan took from him a lease, as appears by

an indenture signed by them both, for ninety-nine years, at an annual rent of fifty-three dollars, thereby, in the most formal manner, acknowledging his title. Sewell, the lessor, died in the year 1848, having, by his will, executed shortly before his death, devised the property to the complainant in this case, who, in the year 1849, filed the present bill, and the question to be considered is, whether there has been such laches and delay as will preclude his right to be relieved. Looking to the admissions of the answer in reference to the occupation of the property by Swan, the grantor, and to the evidence, independent of the answer, I am not prepared to say that there has. The devisor, under whom he claims, purchased the land, as the property of Swan the father, and took from the sheriff a deed in 1831. Swan was then certainly in possession, and under such circumstances, and exercising acts of ownership over it, which might well induce Sewell to believe in the validity of his title. In the year 1839, the lease was executed, being a clear recognition by Swan of his lessor's title at that time, and the possession of Swan down to 1842, when he died, under the lease from Sewell, cannot be used against him, because Swan then held, as the tenant of Sewell. Upon the death of Swan in 1842, the defendants, Baxter and wife, take possession and deny the title of Sewell, but the period which intervened from that time to 1849, when the bill in this case was filed, is too brief to prevent a successful assertion of complainant's title, if in other respects it is free from objection.

I think it is, and will, therefore, sign a decree vacating the deed of the 22d of October, 1819, so far as relates to the property purchased by Charles S. Sewell from the sheriff, and which was devised by the former to the complainant, and the deeds of the same property from Baxter and wife to James Parlett and others.

George H. Brice and Thos. S. Alexander for Complainants.

Coleman Yellott for Defendants.

[An appeal was taken in this case, which is still depending.]