JOHN W. DAWSON AND ROBERT JOHNSTON, JR. *vs.* VIOLA WALTEMEYER, an Infant, by her next Friend, WILLIAM HAPE.

*Fraudulent Conveyances—Evidence—Presumption.*

A conveyance of land was made by a person about the time a judgment was recovered against him. Upon a bill to set the same aside, because fraudulent as against the judgment creditor, the evidence fully established the fraudulent purpose of the grantor. *Held,* that the fact that the grantee in the deed fails to appear or testify or deny his participation in the fraud raises a presumption against him, and the conveyance will be vacated.

Upon a bill to vacate a conveyance because fraudulent as against creditors where the defendant alleges that the grantor possessed property other than that conveyed sufficient to pay his debts, the burden of proving this allegation is upon the defendant.

Appeal from a decree of the Circuit Court for Talbot County, (STUMP and MARTIN, JJ.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, SCHMUCKER and JONES, JJ.

*Thomas S. Hodson* and *Wm. H. Adkins,* for the appellant, Johnston. *John W. D. Jump,* filed a brief for the appellant, Dawson.

*Joseph B. Seth,* for the appellee. The Court declined to hear *M. Star Weil,* also for the appellee.

PAGE, J., delivered the opinion of the Court.

The bill, filed in this case by a judgment creditor of the appellant Dawson, charges that a certain deed from him to Robert Johnston, Jr., was made with intent to hinder, delay and defraud creditors of the grantor and should be set aside, and this appeal is taken from the decree of the lower Court declaring it void as against the appellee.

On the sixteenth day of May, 1897, the appellee, Viola Waltemeyer, obtained a verdict in the Baltimore City Court against the appellant Dawson, for one thousand dollars and costs. Up to that date and prior thereto, Dawson was seized and possessed of a certain farm situated in Talbot County. On the same day on which the verdict was rendered he made a deed to Anna B. Ferguson, in which the consideration named was the sum of four thousand dollars. Of this Mrs. Ferguson, Dawson had no knowledge except that she was a boarding-house keeper in Philadelphia, and the mother of the wife of his son, John W. Dawson, Jr.

The record does not inform us of the circumstances that preceded or accompanied the making of this deed; a copy of it is not filed, and it does not appear where it was executed or acknowledged. It was in the hands of a lawyer in the City of Baltimore on the next day after the verdict was rendered, and was forwarded by him to the Clerk of Talbot County Court, with directions, to record it " as soon as possible and mail to " Mrs. Ferguson, in Philadelphia. On the 18th a motion was made in the case in the Baltimore Court for a new trial and in arrest of judgment. Whether this had anything to do with this disposition of the deed to Ferguson we cannot positively say, but it is certainly suggestive that on the same day, the same lawyer who had forwarded the deed to the Clerk, telegraphed him not to record it but to deliver it to another lawyer. On the next day, the 19th, the same lawyer wrote thanking the Clerk for his promptness and added that " the new deed will be forwarded in a few days."

There never was, however, a " new deed " to Mrs. Fer-

guson executed.    She paid no part of the consideration
called for in her deed, and there is no evidence she had ever
been consulted about the matter or knew anything about it.
When  the  deed  left  the  hands  of  the  Clerk  it  disappears
from the proceedings and we hear no more of it.

But it seems  Mr. Dawson  was  not  idle ; " sometime in
May " he is in Philadelphia at the house of  Mrs. Ferguson.
There,  as  he  testifies,  he  met for the first time,  Mr. John-
ston.    How  Johnston  came  to  be  there  is  not  fully  ex-
plained, but  the  intimation  is  that  it so  happened through
the  agency  of  Dawson's son.    He  was  a total  stranger  to
Dawson himself, who did not, and yet does not know where
Johnston lived or what his occupation was.    Nor was John-
ston  apparently  any  better  informed  as  to  the  property  he
was  to  purchase.    He  had  never  been  in  Talbot  County.
The  exact  date  of  this  meeting  must  have  been  either on
the  19th or 20th of May.    On the 18th of May, the Fer-
guson  deed was  returned  by the  Clerk  of  Talbot  County,
and  it  cannot  be  assumed  that  any  sale  could  have  been
made  to  Johnston until some disposition had been made of
the Ferguson deed.    And on the 21st of  May, the deed to
Johnston was  executed  in the City of  Baltimore.    So that
the exact date of the meeting must have been either on the
19th or 20th of May.                       ·         ·   ·

If  Dawson  received  four  thousand  dollars  in cash from
Johnston, it  must  have  been  paid  on  the  occasion  of  that
meeting in Philadelphia.    So that we have this peculiar sit-
uation.    On  the  18th, the  Ferguson  deed was  returned  to
the lawyer in Easton.    On the 19th or 20th, Dawson must
have  left  Easton,  met  with  Johnston  in  Philadelphia, and
received  the  four  thousand  dollars, and  then  proceeded  to
Baltimore  and  executed  the  deed.    The  acknowledgement
shows that Dawson and wife were there on the 21st of May.
That Johnston should have such  a  sum  of  money " in
paper," under  these  circumstances, and  should  be  willing
to  entrust  it  to  a  total  stranger  for  a  farm  which  he  had
never seen, situated  in  a county where he had never been,

in advance of a deed giving him a title, or other contract in writing, is, to say the least, a most extraordinary business proceeding. Dawson says he put the money in his pocket and did not afterwards deposit in bank nor invest it, and still holds the identical money, except a portion which he has spent.

Under all these circumstances that we should be called upon to believe that Mrs. Ferguson was a real purchaser, that Dawson should have met Johnston at Mrs. Ferguson's at the exact time he did, that Johnston should have purchased a farm which he had never seen, situated in a county where he had never been ; and further, that on that apparently casual meeting, Johnston should have had in his pocket four thousand dollars " in paper " and should then and there have paid it over to Dawson, without a written contract and in confidence that the deed would thereafter be executed, is, in connection with other circumstances of the case, a strain upon our credulity.

The subsequent dealing with Johnston's deed is extremely suggestive. Notwithstanding the deed was executed on the 21st of May, it was not sent for record until the fourth of June, and is then transmitted by the same lawyer who had sent the Ferguson deed. In his letter of transmission, his directions are imperative, he enjoins the clerk to " record (it) out of place " that the original may be " sent me quite promptly." Why such haste ? If there was any special reason for it Johnston must have known it, because the lawyer writes in the same letter, that he desires it to be recorded " out of place," as " he is requested by client to have same sent him as soon as possible." The reason for the haste, however, is apparent, when we are informed that upon the very day when this direction " to record out of date " was given, to wit, the 4th of June, 1898, the motions in arrest and for new trial in the Baltimore Court were overruled and judgment on the verdict was entered.

Up to this day, there was no particular reason why the deed (if it were designed to defraud the appellee) should be

filed for record.   If the motions were granted by the Court, it would never become necessary.   But when the judgment was entered, a new situation arose, and in order to acquire precedence of its lien, it became necessary that the deed should be on file in the record office of Talbot County, before an execution could be issued and received by the Clerk of that county.

It is a significant fact that Johnston, who up to this time had taken no notice of the matter, should now deem it necessary to empower his vendor, John W. Dawson, to manage the property for him.   But even then Johnston does not seem to have evinced much interest in his new possessions, for he makes no inquiries about it, fails to visit it, and does not notify the tenant until after this suit had been begun, and leaves the control of it entirely in the hands of Dawson.

Indeed a full consideration of the entire testimony leaves no inconsiderable doubt in our minds as to the actual existence of Johnston.   No one has ever seen him, except the appellant Dawson and his son.   The former met a man whom he did not know and does not now know, and the latter, as the testimony shows, is a promoter, if not the originator of the whole scheme.

Why was Johnston's identity not established ?   Why did he not himself appear ? or why did not Dawson, Jr.?   There are certain papers in the record purporting to be signed by him, but no one is produced to testify to their genuineness, who has the requisite knowledge to do so, and it is very peculiar that when Dawson, Sr., undertook to reply to them, he was compelled to forward his letters to his son to be delivered by him.

The effect of all these transactions was to place Dawson's property out of the reach of legal process.   Without further dwelling upon the details of the facts proved, it seems to be clear that the deeds to Mrs. Ferguson and to Johnston, and the subsequent management of the farm, constitute parts of a scheme on the part of Dawson to avoid the payment of the appellee's claim.

There are several facts in the case that impress upon us the probability of Johnston's knowledge and participation in the fraud, if in fact there is such a person.   One of these is that his counsel in Baltimore (as appears by the letter of June 4th), was the same person who controlled the Ferguson deed; another is his indifference to the property and the possibilities of this proceeding.   We cannot conceive how a *bona fide* purchaser and an honest man would not be impelled to come forward at the proper time to defend his good name and his property.

Here is a fraud clearly established as to Dawson by a number of facts and circumstances, some of which implicate Johnston; why does he not come forward to vindicate his honor?   In the forum of conscience is he not bound to do so?   Can he remain silent and answer that it is only "suspicious circumstances" that implicate, and not proof? We conceive that such conduct is not consistent with honest dealing.

When, in a case like this, a fraud is proven and suspicious circumstances are shown which implicate a grantee, and those circumstances are peculiarly within his knowledge, we cannot but draw unfavorable presumptions of fact if he fails to offer some affirmative proof that his part in the transaction is an honest one.   If he has acted honestly he should not permit his conduct to wear a doubtful aspect, when by making a statement he can clear up the whole matter.   As was said by the Court in *Conn. M. L. Ins. Co.* v. *Smith*, 117 Mo. 261, " his failure to appear and testify in denial of a charge of something peculiarly within his own knowledge, carries with it the usual unfavorable and damaging presumption."   It, in fact, as was said in *Diggs* v. *McCullough and wife*, 69 Md. 689, amounts to " little less than a formal confession of guilt."   *Whitney* v. *Rose*, 43 Mich. 29; *Dunlop* v. *Haynes*, 4 Heiskel, 476; *Chatterton's case*, 86 Md. 243; *Second Natl. Bank* v. *Yeatman*, 53 Md. 447.

If the appellants deemed it to be important that it should

appear that Dawson had other property than the farm in question, it was incumbent upon them to have proved it. Not having done so the only conclusion is that he had none other out of which his creditors could obtain satisfaction. The case of *Birely* v. *Staley*, 5 G. & J. 455, is decisive of this point. *Sangston* v. *Gaither*, 3 Md. 53; *Worthington* v. *Shipley*, 5 Gill, 449. The decree must be affirmed.

*Decree affirmed.*

(Decided June 14th, 1900.)