# CHARLES A. HINMAN et al. *vs.* JOHN SILCOX.

### *Fraudulent Conveyances—Evidence—Laches.*

Two houses in Baltimore City were conveyed to H. and another one to his wife, on the same day in the year 1890, by separate deeds. H. dealt with the property so conveyed to him, as owner, executing mortgages thereon, collecting the rents, etc. Nearly nine years afterwards and after a suit had been instituted against H. by plaintiff, who recovered judgment, H. executed conveyances of the two houses to his son and daughter. Upon a bill by the judgment creditor to set aside these deeds because fraudulent as to him, the defendants alleged that the houses had been originally purchased with money belonging to H's wife, and that the deeds conveying them to H. were made by mistake. There was a lack of evidence to show satisfactorily that H.'s wife had possessed enough money to buy the

houses, or that a mistake in drawing the deeds had really been made. H.'s son and daughter said that they had paid to their mother a part of the sums expressed as the consideration in the deeds to them, and had given promissory notes for the balance.  *Held*,

1st.  That even if the houses had been originally purchased with money belonging in part to H.'s wife, yet, since she had knowledge of the fact that he held the legal title and exercised acts of ownership over the property and had delayed for so long a time to assert her rights or correct the alleged mistake, she cannot now hold a better position than any other unsecured creditor of H., and that the houses in question are subject to the judgment lien.

2nd.  That since the deeds to H.'s son and daughter were made with the purpose on the part of the grantor and grantees to evade the collection of the judgment, the decree of the Court below holding the deeds to be void, as against the plaintiff and directing the property to be sold unless the judgment be paid, is affirmed.

Appeal from a decree of the Circuit Court of Baltimore City (WICKES, J.)

The cause was argued before FOWLER, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Thomas S. Hodson*, for the appellant.

*Edgar G. Miller, Jr.*, and *Roland B. Harvey* (with whom was *Leigh Bonsal* on the brief ), for the appellee.

BOYD, J., delivered the opinion of the Court.

The appellee filed a bill in equity to set aside two conveyances of leasehold property made by Charles A. Hinman to William C. Hinman and Carrie V. Ellicott, respectively, who are his children, on the allegation that they were made with the intent, on the part of both grantor and grantees, to hinder, delay and defraud the complainant and to prevent the collection of a judgment recovered by him against said Charles A. Hinman.  A judgment was obtained in the State of New York by the appellee against him on the 26th of October, 1886, and he brought suit on it in the Superior Court of Baltimore City on the 24th of October, 1898, and recovered a verdict for $582.76 and

costs, on the 7th day of April, 1899—judgment being entered thereon on the 10th of the latter month.   The two deeds were made on November 30th, 1898—the one to Mrs. Ellicott having been recorded on April 4th, 1899, and the other the day the verdict was rendered.   The consideration named in each of them was $2,000.   The theory of the defense is that the two properties belonged to the wife of Charles A. Hinman and that the deeds for them were made to him instead of his wife through the mistake of Mr. Horwitz, the attorney who drew them.   The Court below held that they were null and void as against the appellee, and passed a decree requiring payment of the judgment and the costs of this proceeding within sixty days and, on failure thereof, directed a sale of the property to be made. From that decree this appeal was taken.

The defendants, William C. Hinman and Charles A. Hinman, and the wife of the latter were called as witnesses by the plaintiff and upon their testimony and the circumstances connected with the transaction he relies to sustain his bill. All of them were hostile witnesses and hence the plaintiff is not bound by their statements to the extent he might have been under other circumstances.   In order that alleged fraudulent transactions may be probed and thoroughly inquired into, it is proper that great latitude should be allowed one seeking to establish fraud through the testimony of those alleged to be participants in it, for in some cases there is no other way of reaching the real facts.   It is impossible to read the evidence in the record without being convinced that motives other than those stated by the witnesses were at least in part the inducing cause of the execution of the deeds.   In October 1885, a deed to Mrs. Hinman for a farm in Talbot County was recorded, for which there was paid $8,000.   Both Mr. and Mrs. Hinman testified that it was her money received from property which originally belonged to her father who died in 1865. Mr. Hinman said they kept no bank account; he had forgotten whether the eight thousand dollars was paid by

checks or in money, did not know how much she had received, but said it came from property in Moravia, N. Y., belonging to his wife, and, as we understand him to mean, inherited from her father. After an adjournment of the commission for several days he was still unable to state the amount she had received, and Mrs. Hinman was equally ignorant of it. He had been in business in New York State before they went to Talbot County, had been postmaster where he lived and is apparently a man of some business qualifications, and testified that his wife's brothers settled their father's estate out of Court.

It is strange that more definite information could not be given as to the amount his wife received from her father's estate, but if we assume that all of the eight thousand dollars was paid out of money that in reality belonged to her, how must this Baltimore property be treated, so far as this judgment is concerned? The answers of the three defendants allege that it was purchased with the proceeds of the sale of the farm, but the testimony shows that the farm was traded for three houses on St. Paul street in that city, one of them in fee and the other two leasehold. The one in fee was conveyed to Mrs. Hinman and the others to Mr. Hinman on February 5th, 1890. The leasehold properties were each subject to an annual ground rent of $141, and there was a mortgage on one for $1,500, and one on the other for $1,200. Mr. Matthews, a real estate agent, who made the exchange, testified that he had told Mr. Horwitz that the deeds were to be made to Mrs. Hinman and when he discovered that those for the leasehold properties had been made out in her husband's name he called Mr. Horwitz's attention to the mistake; that the latter asked him what he thought had better be done and he replied, "let them go on record as they are drawn and they can be changed later on if Mr. Hinman so desires, to carry out the original terms of the contract." He said he suggested to Mr. Hinman to let them remain as they were and he (Matthews) put them on record. Mr. Horwitz was dead when

the testimony was taken and hence his reason for making the deeds of the leasehold property in Mr. Hinman's name cannot be ascertained, as Mr. Matthews does not give any explanation for Mr. Horwitz as to how the mistake, if it was such, was made. It is difficult to understand why an attorney who was drawing deeds in exchange of properties would have made a mistake of that character. There were four deeds in all—one for the leasehold and another for the fee of the property conveyed to Mrs. Hinman, and two for the leasehold properties conveyed to Mr. Hinman. From what we can gather from the testimony Mr. Horwitz seems to have drawn the three deeds for the leasehold interests and some other attorney drew the one releasing the ground-rent on the property conveyed to Mrs. Hinman. Why there were so many deeds the record does not show, but if all of them had been made in the name of the husband instead of the wife, the mistake could be more easily understood, and why, under the circumstances, the attorney would have drawn one to the wife and two to the husband, unless something was said that caused him to understand that such was to be done, is not explained. They all bore the same date and were recorded at the same time.

The two leasehold properties stood in the name of Mr. Hinman from February 5th, 1890, until November 30th, 1898. During that time he gave two mortgages to his sister-in-law, one for $1,200.00 and the other for $1,500.00, which he said was done to get the money with which to pay off the mortgages that were on the houses when they were purchased. Those given by him were paid off and the day one of them was released he gave another to a building association for $500, which amount he said he loaned to his father. He denied that it was used in part payment of the mortgages held by his sister-in-law, and testified that his wife furnished the money to pay both of them. In answer to the question where she got that money, he said, "it came from her father's and mother's estate, and others that have willed her money." But one of the mortgages

was released in 1893 and the other in 1897, and according to his testimony his wife's mother did not die until February, 1899. It can not be true, therefore, that she received anything from her "mother's estate" when the mortgages were paid, and her father died in 1865—twenty-eight years before the one and thirty-two years before the other was paid. Mr. Hinman incidentally spoke of a matter that is very suggestive but not explained in his testimony. He said that in the exchange of the properties Mr. Forman, the party with whom it was made, placed a first mortgage on the farm for four thousand dollars to buy out the ground rent, and pay other expenses against the property conveyed in fee, and added, "the personal property on the farm, consisting of all stock, implements and a steam yacht, I was to receive a second mortgage on for $2,350, as that was the amount invested." Then in answer to the question as to how the deeds were to be prepared, he said "the deeds were to be made to my wife, as she owned the place; the mortgage to me, as I owned the steamboat," and, when asked what mortgage he referred to, replied "the second mortgage of $2,300; that is, the mortgage on the farm." Whether the mortgage was ever given to him, or if it was, what he did with it, or the proceeds of it, he failed to tell. According to his own statement he was entitled to a payment of $2,350 out of the transaction. Yet he testified that he never had any real estate in Maryland and the only personal property he had is a "bicycle and some tools and ropes." What became of the $2,350 he does not attempt to explain.

But if it be conceded that the circumstances we have related do not disprove his statement that the properties were placed in his name by mistake, there can be no question about the fact that during the period of nearly nine years he exercised entire and absolute control over them and they stood in his name. He not only gave two mortgages to raise funds with which to pay those on those properties, and another for $500 which he says he loaned to his

father, and took the releases for them, but he collected the rents and had charge of the houses as any other owner would, so far as we can see from the record. He then conveyed them to· his two children, without having his wife join in the deed to convey or release the equitable interest in them she claims to have had, although she admits she then knew they stood in his name. ·If we accept his statement that the properties were not his, but were conveyed to him by mistake, then we must either believe that he deliberately deceived his wife for nearly nine years, or that she was aware of the fact that they stood in his name. Which is the more probable? If the former be true, then must a Court of Equity accept the testimony of a man who seeks to convince it that he is not now attempting to deceive his creditors by showing that he did deceive his wife during all that period? One who would thus perpetrate a fraud on his wife would not hesitate to attempt to defraud creditors. But no object in deceiving her is shown, for if the property was conveyed to him by mistake it was not his mistake, and it was one that could easily have been corrected by transferring it to her. Both of them admit that she was aware of his giving three mortgages on it and doing other acts that impute to her knowledge of the condition of the title. Women otherwise intelligent are sometimes very ignorant of business dealings, but it requires much credulity to enable one to believe that a woman who can testify as intelligently as this witness did, in reference to these very transactions, would suppose that her husband could mortgage *her property* as he pleased, without uniting in the mortgage herself. If he could mortgage them, he could sell them. She had joined in the deed for the Talbot farm and apparently had in her possession the deeds to herself for the property conveyed in fee to her, as she produced them when asked to do so, and Mr. Hinman testified that Mr. Matthews delivered the deed in fee to her. So whether or not it was originally intended that all the deeds should be in her name, we are convinced that she at least had suffi-

cient knowledge of the condition of the title to call upon her to assert her claim to the properties without unnecessary delay and she must be held to have consented to permit them to remain in his name. He paid off the two mortgages that were on the houses when the deed was made by borrowing money in his own name, and giving mortgages to secure it. They were *his* debts alone and whether or not it be true that his wife furnished all the money to pay the mortgages thus given by him is immaterial, as that fact cannot give her a claim on the property prior to the judgment of the appellee. He could have had them assigned to his wife, if she in fact paid the money, but he had them released and there is no evidence that he even promised to repay his wife the money alleged to have been advanced by her ; indeed he testified that he did not. Mrs. Hinman was not made a party to this cause, as there was no occasion for it from the knowledge the plaintiff could acquire from the records, and she has not asked to be made a party, although she was a witness. But if we apply the principles applicable to a resulting trust, she cannot now be heard to assert her claim to the prejudice of this judgment. " It is well settled that a subsequent advance will not attach, by relation, a resulting trust to the original purchase." *Keller* v. *Keller,* 45 Md. 275. If it was established by "plain, direct and unequivocal evidence" that these houses were purchased for her with her money, the title taken in her husband's name, without her knowledge, and there had been " no *laches* or delay or any acquiescence on her part to impair or defeat her rights," then, if she did furnish the money to pay off the mortgages, she might occupy a different position, but as we are of the opinion that she must be held to have been aware of the fact that the title was in him and that she acquiesced in it, she cannot now hold any better position than any other creditor would have held for the money she advanced him to pay off the mortgages. The judgment is for much less than the amount of the mortgages paid by him, and to that extent at least he had an

interest in these houses and there is therefore no reason, so far as she is concerned, why the relief sought in this case should not be granted.

Nor have we the least doubt that the deeds were made with the intention on the part of the grantor and the grantees to evade the collection of the judgment. The execution of them so soon after the suit was brought, and withholding them from record until about the time judgment was recovered, together with the fact that nothing was paid Charles A. Hinman, and very little to Mrs. Hinman, to whom they claimed the money was due, and other circumstances raise too strong presumptions to be overcome by such explanations as have been attempted. The consideration stated in each deed is $2,000, but the proof is that the son and daughter gave their respective notes, *payable to their mother*, for those amounts. The son paid to his mother, a day or two after the note was given, either two or three hundred dollars, (the evidence is not clear as to which it was) and the daughter paid two hundred dollars on her note shortly afterwards. No other sums have been paid by them. The son testified that he supposed the properties were each worth $2,500, but gives no explanation as to why they were conveyed to them for $2,000. Neither of them is shown to have been financially able to invest in such properties. The son, who is unmarried, lived with his parents, and was receiving a salary of sixty dollars per month as a book-keeper. He doubtless heard of the suit when it was brought, and he admitted that his father had collected the rents and given the receipts therefor since the deed to him was made, although the house was only a few doors from where he lived. The daughter lived in a suburb of New York City, and is the wife of a clerk in a library. Her father continued to collect the rents from the house conveyed to her. There is nothing in the testimony to show that there was any apparent change of ownership in either of the two houses before the deeds were recorded, and even after that their father continued to collect the

rents. There are so many attempts by debtors to transfer property held by them to other members of their families and thus evade their creditors, although still having the benefit of the property either for themselves or those in whom they are interested, that it behooves Courts to demand of such parties, relying on ·transactions which are fraught with suspicious circumstances and opportunities for fraud, that they give frank, clear and full explanations of their dealings with each other. This these defendants have failed to do; and under all the facts and circumstances disclosed by the record, we are convinced that the transfers were made to avoid the payment of this judgment, and the decree of the Court below will be affirmed.

> *Decree affirmed, costs to be paid by the appellants.*

(Decided June 16th, 1900.)