## HARRY B. JAMES ET AL.

### *vs.*

## T. HOWARD MURRAY ET AL.

*Fraudulent Conveyance—Husband and Wife—Evidence.*

On a bill to set aside a transfer of property by a husband to his wife as in fraud of plaintiff's decedent, who had brought suit against the husband on account of personal injuries caused by the latter's negligence, *held* that such transfer could not be supported as relating back to, and confirmatory of, an alleged deed of such property by the husband to the wife, made some months before the accident, in satisfaction of an indebtedness by him to her, which deed had, because mislaid, not been recorded.                               pp. 105-107

That the husband and wife failed to mention such alleged prior deed to their counsel until after their answers had been filed in the suit to set aside the later transfer, and that they then produced it, and endeavored to make the later deed refer back thereto, *held*. together with contradictory statements by the husband as to his purpose in making the deed and his reasons for not sooner paying his alleged debt to his wife, to constitute evidence of a fraudulent intention on his part.

pp. 107, 111

Code, art. 45, sec. 1, requiring creditors to attack a conveyance to the debtor's wife "within three years after the acquisition of the property by the wife," does not bar the creditors until three years after the recording of the deed by which the property is acquired by the wife, as against a creditor without knowledge of the transfer.                    pp. 107-109

On an issue as to the validity of a transfer by a husband to his wife, as against the former's creditors, that the court refused to admit a previous unrecorded deed of the same property by the husband to the wife, or to allow the consideration for such previous deed to be shown, *held* not to excuse the failure of the wife to testify in support of the later transfer.         p. 112

A mortgage made by the mortgagee's father and mother, after a suit for damages had been brought against the father,

102              JAMES vs. MURRAY.

for a sum, actually paid by the son, considerably larger than the value of the property, *held* to be invalid as against the judgment in such suit.                                    p. 116

On setting aside a transfer of property by husband to wife as in fraud of the husband's creditors, and requiring her to account for the value of the property, *held* that in view of the unsatisfactory character of the evidence as to the value of such property, the cause should be remanded in order to obtain further evidence as to its value.                          p. 117

*Decided January 9th, 1923.*

Appeal from the Circuit Court for Harford County (HAR-LAN, J.).

Bill by J. Howard Murray, administrator *c. t. a.* of Charles T. Waltring, deceased, against Harry B. James and others, to set aside certain transfers as in fraud of creditors. Said defendant James having been adjudicated a bankrupt, Harry S. Carver, his trustee in bankruptcy, was substituted as complainant. From a decree in accordance with the prayer of the bill, the defendants appeal. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, STOCKBRIDGE, and ADKINS, JJ.

*Stevenson A. Williams* and *Philip H. Close,* with whom was *Fred. R. Williams* on the brief, for the appellants.

*A. Freeborn Brown* and *Elmer A. Cook,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The bill of complaint was filed in this case by J. Howard Murray, administrator *c. t. a.* of Charles T. Waltring, deceased, against Harry B. James, Ida M., his wife, and E. Roy James, their son, for the purpose of having a deed from Harry B. James to his wife, dated December 5, 1918, and a mortgage from Harry B. and wife to E. Roy James, dated September 23, 1920, declared null and void and set aside. There is also a prayer to require Mrs. James "to deliver up and hand back" certain personal property transferred and

given by her husband to her, and injunctions against the three defendants were asked for.

On the 18th day of April, 1918, Charles T. Waltring was run over and seriously injured by an automobile of Harry B. James, and on the 22nd of the following August he instituted a suit against James to recover damages for the injuries sustained. At a trial the court withdrew the case from the jury, instructing a verdict for the defendant. On appeal to this Court, the judgment on that verdict was reversed with costs, and the case was remanded for a new trial, being reported in 136 Md. 406. A few months after the judgment was reversed in this Court, Charles T. Waltring died, Mr. Murray, his administrator *c. t. a.,* was made party plaintiff, and on the 8th of April, 1921, a verdict was rendered in favor of the plaintiff for $8,000, upon which judgment was entered. This bill of complaint was filed on the 19th of April, 1921, and on May 18, 1921, Harry B. James filed a petition in voluntary bankruptcy, and on the same day was adjudicated a bankrupt. On June 14, 1921, Harry S. Carver, trustee in bankruptcy, was substituted as complainant in the cause. On February 22, 1922, a decree was passed setting aside the deed of the 5th of December, 1918, from Harry B. to Ida M. James, the mortgage from Mr. and Mrs. James to E. Roy James, and the transfer of the personal property mentioned in the proceedings, and declaring them to be null and void, "so far as the same may interfere with or in any manner affect the rights and claims of the estate of the said Charles T. Waltring, deceased, and any and all other creditors of the said Harry B. James."

The decree further required Ida M. James to account, on or before the first day of May, 1922, with Harry S. Carver, trustee, for the full value of the personal property so handed over to her by the purported transfer from said Harry B. James, "the value of said personalty, as fixed by the testimony in said case, being seven thousand dollars ($7,000)." The defendants were directed to pay the costs. From that decree this appeal was taken.

An order was passed granting an injunction as prayed for in the bill, the day it was filed, upon filing a bond in the penalty of five hundred dollars, the court giving the defendants the right to move for the rescission of the order and a dissolution of the injunction. That motion does not appear to have been made, and the case was disposed of as if on final hearing. The defendants filed separate answers, and Mr. and Mrs. James, with leave of the court, amended their answers, setting up a defense which was not made in the original answers, and which it will be well to now refer to.

The bill alleges that when Waltring was injured and when he instituted his suit for damages and filed his declaration setting forth his claim, Harry B. James was the owner of certain real estate in Harford County, worth between four and five thousand dollars, and was also the owner of considerable personal property, worth seven or eight thousand dollars, all of which was unincumbered and in the possession, use and enjoyment of said Harry B. James; that on the 5th day of December, 1918, said James executed a deed of all the real estate he owned to his wife, for a simulated and pretended consideration, and at the same time undertook to dispose of all his personal property to her, who took possession of it, by handing it over to her and having it transferred to her upon the assessment books of Harford County.

In the original answers of Mr. and Mrs. James they admitted the execution of the deed, and that at the time Harry B. James held the legal title of the real estate mentioned and part of the personal property, but alleged he was indebted to his wife, and had been for a number of years, in a large sum which he had agreed to pay her, and agreed to repay her in part by the conveyance of the real estate and certain personal property held by him. They denied that the consideration was simulated and pretended, or that the transfers were in prejudice of the rights of his creditors. They alleged that the real estate was, on or about the 5th of December, 1918, worth about three thousand dollars, and that the personal property was not worth anything like the

sum mentioned in the bill. Those answers were filed on
May 26th, 1921, and on July 6th, 1921, the amended answer
of the husband was filed and, on July 11th, that of his wife.
In the amended answers they alleged that by deed dated the
6th of December, 1917, he had conveyed the real estate and
personal property to his wife; that said deed was duly exe-
cuted before Ryland L. Mitchell, a notary public, and was
immediately delivered by the husband to his wife, and there-
after remained in her possession. This appears in both
amended answers, "and that, by inadvertence and because
the same was mislaid or believed to have been lost, the said
deed was not recorded by this court within the time required
by law; that thereafter, on or before the 5th day of Decem-
ber, in the year 1918, when it was discovered that the said
deed had not been recorded, and was believed to have been
mislaid or lost," the said Ida required and demanded that
"Harry B. James confirm the said deed and execute and
deliver to her a deed for said property in order that the
same might be recorded as required by law."

They claim that the deed of 1917 was not found until
June, 1921, after their original answers had been filed. It
is difficult to understand why no reference was made to it in
the original answers, but that was not only not done, but in
them they say that the deed of December 5th, 1918, was
executed and delivered in pursuance of the agreement he
had made to her. In speaking of the personal property, Mr.
James alleged "that the same was sold or delivered to her
on or about the date of said deed"—referring to the deed
of 1918, and Mrs. James alleged in effect the same thing.
We understand that it is conceded that the deed of 1918
(which is not set out in the record) makes no reference to
the one of 1917, does not show that it was made as a con-
firmatory deed, or that a prior one had been made which
was lost or mislaid. If it was found in 1921, why it could
not have been in 1918, or why it was left off the records so
long, is not explained. The certificate of acknowledgment
of that deed omits the year. As the deed was dated the 6th

of December, 1917, if it had been recorded at any time before the 6th of December, 1918, it could have been presumed that it was acknowledged the 6th of December, 1917, under what is said in *Wickes* v. *Caulk,* 5 H. & J. 36, 42, and *Basshor* v. *Stewart,* 54 Md. 376, and the general desire of courts not to permit mere technical omissions or errors in certificates of acknowledgment to injuriously affect instruments required to be acknowledged and recorded. So far as the record discloses, it has never been recorded.

Our statutes are very liberal in allowing absolute deeds to be recorded after the six months period provided in section 13 of article 21 of the Code, and *when so recorded,* as against the grantor, his heirs or executors, and against purchasers with notice and creditors who become so after the recording of the deeds, they have the same validity and effect as if recorded within the time prescribed (section 19, article 21). But as the deed of 1917 apparently has never been recorded, and certainly was not before the one of 1918, we cannot understand how it can have any effect as a deed. It is unnecessary to consider the effect of the notice to a third party of an unrecorded deed, or the grantee taking possession of lands purported to be conveyed, as it is not shown that the creditors had any notice of the deed of 1917, or that the grantee took possession of the lands before the deed of 1918 was executed and recorded. In addition to that, so far as the personalty is concerned, it cannot be properly contended that the deed of 1917 would have transferred it, as Mr. James still retained possession of it, and the deed was not executed as a bill of sale or mortgage of personal property must be, or that anything was done under it which gave it any effect as a deed.

It would greatly increase the danger of fraud in transactions between husband and wife, if the deed of 1917 could be given the effect claimed for it. It was made, according to the date in the body of it, before Waltring was injured, while the one of 1918 was made after the accident, after the suit was brought, and shortly after the declaration was filed,

showing the claim of the plaintiff for $30,000 damages, but
if a husband and wife can have such a transaction as this
between them, have a deed from him to her of all his prop-
erty, keep the deed off the records, put it away so that they
did not find it for nearly four years, then a year after its
execution, during which time the husband incurred liabili-
ties, execute another deed which is put on record, and then
have the transaction relate back to the first deed, there would
be little or no protection against those who were willing to
defraud, hinder or delay creditors. That cannot be per-
mitted, and the deed of 1917 cannot be given the efficacy
claimed for it.

The conduct of Mr. and Mrs. James in reference to that
deed is as suggestive of fraud as almost anything else in the
record. Their indifference about it after it was executed,
not mentioning its existence to their counsel until after
their answers were filed, when they apparently did "realize
the importance of the first deed in this case," then producing
it and endeavoring to make the deed of 1918, under which
they acted, relate back to 1917, is strong evidence to show
that their great effort was to cut out the Waltring claim.

The contention of the appellants very forcibly suggests
some of the dangers which creditors would meet with if it
could be sustained. The brief of the appellants is divided
into three principal heads, the first of which is "as to the
'original and primary' deed of December 6th, 1917, con-
firmed by the 'secondary and derivative' evidential deed of
December 5, 1918, to be tested by article 45, section 1."
Under that it is earnestly claimed that the limitation in the
statute in that section commenced to run on December 6,
1917, the date of the first deed, and as the bill was not filed
within three years from that date, it "should be dismissed
*quoad* the deed of December 5th, 1918, which is merely
'evidence' of the original deed of 1917." That section of
article 45 is the well known one providing for protecting
property of the wife from the debts of her husband, "pro-
vided, that no acquisition of property passing to the wife

from the husband after coverture shall be valid if the same
has been made or granted to her in prejudice of the rights
of his subsisting creditors, who, however, must assert their
claims within three years after the acquisition of the prop-
erty by the wife or be absolutely barred." While the lan-
guage of the statute is "within three years after the acquisi-
tion of the property by the wife," it cannot be successfully
contended that a husband can make a deed to his wife, keep
it off the records for three or more years, and then, when it
is attacked, be permitted to have the benefit of the statute
from its date. Such a construction of the statute would
make it nugatory so far as the rights of creditors were con-
cerned. In speaking of a deed from husband to wife in
*Dixon* v. *Dixon*, 128 Md. 1, 6, JUDGE URNER said: "The
first effort to have it declared void, as being in prejudice of
creditors, was made in May, 1914, more than seven years
*after the deed was recorded.* By the explicit terms of the
statute such a proceeding must have been instituted within
three years after the conveyance." Of course, that did not
mean three years after the date of an unrecorded and un-
known deed. In *Stieff Co.* v. *Ullrich,* 110 Md. 629, it was
said, on page 634, that the deed then in question "should
have been attacked within three years *from the date of its
recordation,"* and in *Wilson* v. *Vandersaal,* 134 Md. 481, it
was said, on page 491, that section 14 of article 57 was not
an answer to section 1 of article 45, "unless at least there
was some act or omission on the part of the wife which kept
the plaintiff in ignorance of the alleged fraudulent transfer,
which, with usual or ordinary diligence, might not have been
known or discovered." In that case it was implied through-
out that the bar of the statute did not begin to run until the
deed was recorded, unless the creditor had notice of it or
had some knowledge which put him on inquiry. There can
be no doubt that in this case the plaintiff was not barred by
the provision in section 1 of article 45, as the statute did not
begin to run until the recording of the deed of December 5,
1918. As the bill was filed April 19, 1921, it is not material

when that deed was recorded, as it was executed less than three years before the proceedings to set it aside were begun.

Section 15 of article 21 provides that "no deed of real property shall be valid for the purpose of passing title unless acknowledged and recorded as herein directed." Neither sections 19, 20, 21, nor any other in article 21, relieves the appellants under the facts of this case, as the deed of 1917 was not recorded at all, and they did nothing which could be a substitute for recording.

Inasmuch as there can be no possible doubt that the limitation in article 45, section 1, could not have begun to run from the date of the deed of December, 1917, if it had been admitted in evidence, we cannot understand how the appellants were injured by its rejection, as everything necessary to sustain it as an agreement was brought out in connection with the deed of December, 1918, and we have it before us in the record and find nothing to show injury to the appellants by reason of its rejection as an agreement. It was not admissible as a deed, and the proffers of the appellants set out in the record could not make it so. The record shows that the ruling of the court was distinctly made as "to the two offers as proving the consideration of the deed of 1917." Again the judge said: "I have taken this in connection with the deed of 1917. The question of your ability to show a consideration for the deed of December, 1918, is an entirely distinct proposition. These offers, as I understand, are made in connection with the deed of 1917 to show consideration for that deed. That is what I am passing on, whether these two offers, couped with the deed of December, 1917, give the right to put that deed in evidence. The question of the consideration of the deed of 1918 is an entirely different proposition." The court did not rule out all of the evidence contained in the proffers. In point of fact, some of those matters were testified to, and others undoubtedly could have been, if offered. We do not understand that the court ruled that Mrs. James could not testify in reference to the deed of 1918, or anything that we think was properly

admissible as reflecting on the consideration upon which the
appellants based their right to have the transfer of the prop-
erty made by the husband to the wife, but from what we have
already said it will be seen that the court was right in refus-
ing to give the deed of 1917 the effect claimed for it.

The appellants contend that the conclusion of the Judge ·
below was largely based on suspicions, in addition to what
they claim were errors, especially in reference to the deed
of 1917. But we confess our inability to understand the
theory set up as to the effect of that deed. How the unre-
corded deed of 1917 can draw up to its date the deed of 1918,
or be treated as confirmed by the later deed, is beyond our
comprehension, under the circumstances of this case. Be-
sides, on May 25th, 1921, Mr. and Mrs. James filed answers
under oath, in which they swore that at the time Waltring
was injured and the suit was instituted, Harry B. James
held the legal title to the real estate referred to, and at least
a part of the personal property mentioned in the bill. If by
the other deed, which they claim was executed in December,
1917, the real estate and personal property were conveyed
and transferred to her, they must have known it when they
swore to the original answers, which are in direct contra-
diction of their statements in the amended answers. Accord-
ing to the proffers, they did not mention those facts to their
counsel until the deed was found in June, 1921, as we might
well assume they did not, knowing the high standing and
ability of their counsel, and the only reason given in the
proffers for not mentioning it to them was that they believed
the second deed was good and valid, and did not realize the
importance of the first, but they do not pretend that they did
not know what the deed of 1917 contained, or what they did
after it was made. The reason given in the proffer for not
mentioning the deed of 1917 to their counsel is very sug-
gestive—that they did not realize the importance of it.

But that is not all. There was no transfer of the real or
personal property attempted, following the deed of 1917,
but, as of December 5, 1918, the real estate and improve-

ments conveyed by the deed of 1918 were transferred from
Mr. to Mrs. James on the tax books, and on the 11th of
February, 1919, there was a schedule of personal property
filed with the tax authorities which was sworn to, signed,
"Ida M. James, per Harry B. James." The total of that
personal property was $7,350, and it had been previously
assessed to Harry B. James. The clerk to the county com-
missioners testified that they cancelled it from his account
and carried it over to hers. Mr. James testified that the
property was not worth $7,350, but also said that the tax
assessor thought it was, and he could not get it lower. In
January, 1918, he made a return for his wife of personalty
to the tax office and it was $350. That was after the deed
of 1917 was made. He was asked on cross-examination,
"Where did your wife get over $7,000 worth of personal
property she had assessed to her in February, 1919, when
she only had $350 in February, 1918?" and replied, "I
deeded it to her." Again he was asked: "Didn't you get rid
of all your property in the fall of 1918, real and personal?"
and replied, "Only by deed."

The claim of the appellants was that Mr. James owed his
wife for rents from 1890 up to the time he transferred his
property to her, amounting to thirteen thousand dollars,
which he had collected and promised to pay her, but had not
done, and that the transfer of the properties was in part
payment of that sum. Yet when asked, "Did you think the
conveyance of the real and personal property to your wife on
December 5, 1918, protected you in the case of Waltring
against you if he had gotten judgment against you in the
damage suit?" he replied, "I didn't give it a thought. *I
gave her the deed to protect her for endorsements she had
given me in the banks.*" That is a flat contradiction of the
other reason he gave for making the deed. Both cannot be
true, and as his wife was permitting him, according to the
one claim, to collect and retain, for the most part at least,
the rents from 1890 to the time he made the deed, it was
much more probable that it was made on account of the

endorsements—although it was not shown that she paid off
the notes on which she was endorser, excepting with what
she got from her son on the mortgage of September 23, 1920.
The property from which the rents were received was for
the most part paid for by the husband—Mrs. James only
paying $500 out of $2700 on it, the $2200 being allowed
as Mr. James' share of his father's estate, to whom this
property formerly belonged. Under those circumstances, it
would not be strange if she permitted her husband to collect
and keep the rents, especially as he was improving the prop-
erty from time to time and was conducting a business, in the
success of which Mrs. James, as his wife, was interested.
To permit him to return the rents from 1890 up to the time
just after Waltring sued him for $30,000 damages, and
then demand and acquire some more of his property in
payment or part payment of the rents, is what might well
be termed very suspicious, to say the least—especially when
such excuses as he testified to for not paying her sooner are
considered, such as he did not have time to make out the
accounts, etc. The bank officer showed that in 1918 he
deposited over $42,000 in one bank, of which there were
discounts amounting to $9,000, and it was shown that the
bank never allowed a line of over ten thousand dollars.

We have shown above that in our judgment the court was
right in not admitting the paper of 1917 with the proffers
made, as a deed, and that we must treat the deed of 1918
as the first attempt to convey the real estate and transfer
the personal property, and that we did not understand
that the Judge below refused to permit Mrs. James to tes-
tify, but only declined to admit the deed of 1917 with the
proffers of first proving by her and her husband what is con-
tained in them, and Mrs. James cannot excuse herself for
not testifying by reason of the ruling of the court on those
proffers. Some things contained in them were admissible
testimony, and were actually admitted in the evidence of
Mr. James, while other things were not admissible, but the
fact is that the lower court did not refuse to permit her to

testify, and she was not offered as a witness. It would never do to hold that a party who is called upon under the law to explain a transaction with which she was connected could give as a sufficient excuse for not testifying, such a ruling as that made by the lower court on the proffers. The real question before the court was whether the deed of 1917 was admissible, if what was stated in the proffers was established—not whether the witness referred to in the proffer could testify, or what she could testify to.

Without repeating what we have already referred to at length, we are of opinion that there is ample in the record to sustain the finding of the lower court that the deed was made by Harry B. James with intent to hinder, delay and defraud the Waltring claim, and there was sufficient shown to demand of Mrs. James an explanation of her conduct and proof that she was not a party to such intent. Of course it will be conceded that section 1 of article 45 "does not prevent the husband from treating his wife like any other creditor, if the relation of debtor and creditor is proved to exist between them," as was said in *Crane* v. *Barkdoll,* 59 Md. 534, by JUDGE MILLER, in speaking for the Court; but we cannot be unmindful of the other side of the question, that when a husband undertakes to turn over to his wife all the property he has, just after a suit for thirty thousand dollars damages is brought against him for injuries sustained by the plaintiff from his negligence, such a transaction between husband and wife must be very carefully inquired into, and the court must be fully satisfied that it is both *bona fide,* and for a valuable consideration. We said in *Hinman v. Silcox,* 91 Md. 576, 585, that "there are so many attempts by debtors to transfer property held by them to other members of their families and thus evade their creditors, although still having the benefit of the property either for themselves or those in whom they are interested, that it behooves courts to demand of such parties, relying on transactions which are fraught with suspicious circumstances and opportunities for fraud, that they give frank, clear and full expla-

nations of their dealings with each other." And, as was said in *Dawson* v. *Waltemeyer,* 91 Md. 328, 333, "when, in a case like this, a fraud is proven and suspicious circumstances are shown which implicate a grantee, and those circumstances are peculiarly within his knowledge, we cannot but draw unfavorable presumptions of fact if he fails to offer some affirmative proof that his part in the transaction is an honest one." That was said in a case in which the parties were not, as in this, a husband and wife and a son, all charged with frauds. When a wife relies on her right to be paid by her husband, who is unable to meet all his debts, a stale claim, begun nearly thirty years before the transaction complained of, she cannot sit back and simply rely on her husband to see her through, especially when the husband, in his testimony, makes two conflicting statements as to the basis of the transaction. As was said in *Marowitz* v. *Land,* 130 Md. 514, 521, "It is essential to the validity of the transfer of the property to Marowitz that it was not only made on a good consideration, but that it was also *bona fide.* If it were not made in good faith it is void, although the grantee may have paid a full consideration therefor."

In *McCauley* v. *Shockey,* 105 Md. 641, *Chatterton* v. *Mason,* 86 Md. 236, and other cases in this State, the same principle is announced as that we quoted from *Marowitz* v. *Land, supra.* In *McCauley* v. *Shockey* it was also said: "From the nature of the case, a creditor attempting to set aside a conveyance as fraudulent can seldom prove as an independent fact the knowledge of or participation in the fraud by the grantee. That knowledge or participation must be gathered from the various facts and incidents composing the transaction and its environment." In that case a bill was filed by a creditor to set aside a mortgage given by two brothers to their two sisters for an alleged indebtedness. At the time the mortgage was given, suits by the appellant were pending against the brothers for slander and he subsequently obtained judgments against them. The brothers

and sisters were owners of a farm, and at intervals of a year or longer they had settlements and the brothers gave the sisters their notes for balances due, and a mortgage was given by the brothers to the sisters to secure these notes. JUDGE SCHMUCKER said that by the transactions referred to in that case, "the two Shockey brothers stripped themselves of all property which could have been resorted to by the plaintiffs for satisfaction of the judgments against them. The natural and inevitable result of these transactions of the two brothers being to hinder, delay and defraud the plaintiff in respect to the collection of his judgments against them, the normal presumption of innocence on their part is overthrown, and they are chargeable with the intent to produce that result, and the mortgage must, so far as they are concerned, be regarded as fraudulent. The law conclusively presumes every man to intend the necessary and even the probable consequences of an act deliberately done." He then considered the question as to whether the mortgagees could be held responsible, and said: "The circumstances shown by the evidence in this case to have surrounded the execution of the mortgage to the two sisters were such in our opinion as to negative the presumption of good faith on their part and call for frank disclosures and full proof of all of their dealings in connection with that transaction. They had for years been living in the same house and eating at the same table with their brothers. * * * In the simplicity of that rural home, so exciting a subject as threatened or pending slander suits against the brothers and the probable effect upon them of an adverse result of the suits, and the ways and means of providing against such a misfortune must have formed the theme of current discussion at the common fireside and table." Then, after discussing the question quite fully, and referring to some other transactions between them, the Court said: "We deem it unnecessary to pass upon the weight of that evidence or the sufficiency of the consideration for the mortgage, because we have determined that the mortgage must be declared void as against th plaintiff's

judgments, because of the mortgagee's knowledge of and participation in the fraudulent purpose of the mortgagors in executing it. To sustain a mortgage made to secure creditors by a debtor in the condition of the mortgagors in this case it is essential to establish both a sufficient consideration and a *bona fide* consideration." The mortgage was accordingly set aside in so far as it interfered with the collection of the plaintiff's judgments.

We have referred more at length than usual to that case, as it seems to us to apply with great force to the one now before us, although, of course, there were some transactions shown there which do not exist here. When we remember that this deed was between husband and wife, affecting interests which so directly concerned the wife, her silence cannot be excused, and, as shown above, the ruling of the lower court as to the proffers were not sufficient to furnish an excuse.

We are also of the opinion that the mortgage given by Mr. and Mrs. James to their son must likewise be set aside. It is shown that he was familiar with the Waltring suit, and although his mother had valuable property outside of that conveyed to her by the deed of December, 1918, he took the mortgage on that property alone for $5500, although his father swore in his answer that at the date of the deed it was only worth about $3000. That mortgage was dated September 23rd, 1920, which was about three months after the judgment in favor of the defendant had been reversed by this Court and remanded for a new trial. The son testified that he knew his father's financial condition was not good, and that he wanted the mortgage for the protection of his own wife and children. It is said by the appellants that Mrs. James paid off her husband's notes at the Citizens' Bank with the check of $5500 received from their son, and hence they argued that his creditors got the benefit of that mortgage, but, without deeming that very material, the testimony of the bank officer was that, of the proceeds of the original notes, for which those for $5500 were renewals,

$1000 went to Mr. James' account and $4500 to Mrs. James' account. When those and other matters shown by the record are considered, we are satisfied that the court was right in setting aside that mortgage, in so far as it interfered with the creditors. Much of the law referred to above is applicable to this branch of the case, and many other authorities might have been cited.

We are also of opinion that the court was right in setting aside the transfer of the personal property in the proceedings mentioned, and that she should be made to account to the plaintiff for the full value of it, but we are not satisfied to hold from this record that that property was worth $7000 at the time it was transferred to Mrs. James. It is true that personal property was transferred from Mr. to Mrs. James which amounted to about that sum, according to the assessment books, but that is practically all of the testimony from which it can be said that there was such value. There is some testimony to the contrary in the record, and, on the whole, the evidence on the subject seems to us to be very unsatisfactory. We have, therefore, determined to affirm the decree in part and reverse it in part, and will remand the cause so that the lower court can have further evidence taken as to the value of said personal property; but, under all the circumstances, we will require the appellants to pay all the costs in this Court and two-thirds of those in the lower court, the appellee to pay the remaining third.

> *Decree affirmed in part and reversed in part, and cause remanded, the appellants to pay the costs in this Court and two-thirds of those in the lower court, the appellee to pay the remaining third.*